USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/16/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROBERT DE LA CRUZ,

                         Plaintiff,

          -against-

ECOLAB INC.,

                        Defendant.
------------------------------------------------------------------X

1:18-cv-06983-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

Plaintiff Robert De La Cruz ("Plaintiff" or "De La Cruz") brought this product liability action against Defendant Ecolab Inc. ("Defendant" or "Ecolab"), alleging that his exposure to Apex Presoak, a dishwashing product manufactured by Ecolab, resulted in a chemical burn that later required the amputation of his foot. De La Cruz asserts that Ecolab is liable for his injuries because it failed to warn him that Apex Presoak could cause chemical burns. Ecolab has moved for summary judgment, arguing—among other reasons—that De La Cruz has failed to demonstrate that Ecolab "knew or should have known" that Apex Presoak could cause chemical burns, and thus Ecolab cannot be held liable for failure to warn De La Cruz of this risk.[1] Because the Court agrees that De La Cruz has not put forth sufficient evidence that Ecolab knew or should have known that its product could cause chemical burns, Ecolab's motion for summary judgment is GRANTED.

## I. BACKGROUND

The Court views the facts in the light most favorable to the non-moving party. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Unless otherwise indicated, the following facts are undisputed.

---

[1] In addition to its motion for summary judgment, Ecolab also moved to exclude the testimony of Plaintiff's experts. Because the Court has granted Ecolab's motion for summary judgment, it need not reach the issues raised by Ecolab's motion to exclude Plaintiff's experts' testimony.

1

De La Cruz began work as a temporary dishwasher at the former Waldorf Astoria Hotel in New York City (the "Waldorf") on March 27, 2015. Plaintiff's Response to Defendant Ecolab Inc.'s Rule 56.1 Statement of Undisputed Material Facts, Dkt. No. 39-1 ("Def. 56.1 Stmt."), at ¶¶ 1, 42; Defendant Ecolab Inc.'s Response to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts, Dkt. No. 47 ("Pl. 56.1 Stmt."), at ¶ 195. The Waldorf did not provide De La Cruz with any job instruction or training when he was hired or during his first four days at the hotel. Def. 56.1 Stmt. at ¶¶ 41, 44. When De La Cruz arrived at work at 8 o'clock in the evening on March 31, 2015, he was told to go to the fourth floor and to wash the dirty dishes that were there. *Id.* at ¶ 45; Pl. 56.1 Stmt. at ¶ 206. He did not receive any further instructions. Def. 56.1 Stmt. at ¶ 45.

After reporting to the fourth-floor kitchen, De La Cruz first spent about four-and-a-half hours loading the dishwashers with glasses and dishes. *Id.* at ¶ 47. When he came to a stack of approximately 100 large round plastic trays, he first tried to load those trays into the dishwashers. *Id.* at ¶¶ 48, 50. After he realized the trays would not fit in the dishwashers, De La Cruz decided to wash them by hand. *Id.* at ¶ 50. De La Cruz noticed that a pump and hose were attached to the wall near the sink. *Id.* at ¶ 49. When pushed, the pump dispensed a blue liquid. *Id.* De La Cruz poured some of the blue liquid into a one-fifth gallon container and added water. *Id.* at ¶ 50. He used that mixture to hand wash the trays with a sponge and then rinsed each tray with water. *Id.* De La Cruz did not measure the amount of the blue liquid he used, though he estimated that over the course of the hour and a half he spent cleaning the trays he dispensed the liquid from the pump into the one-fifth gallon container over thirty times. *Id.* at ¶¶ 50-51.

Unbeknownst to De La Cruz, the blue liquid he used as dishwashing detergent was instead a product called Apex Presoak. Def. 56.1 Stmt. at ¶ 50; Pl. 56.1 Stmt. at ¶¶ 180-81. Apex Presoak, which is manufactured by Ecolab, is used to soak silverware to remove food soil before the silverware is machine washed. Def. 56.1 Stmt. at ¶ 1; Pl. 56.1 Stmt. at ¶ 166. At the time Ecolab

2

products were installed in the Waldorf in late 2013, an Ecolab employee conducted a training at the Waldorf in which he taught hotel employees how to use Apex Presoak, including how to properly dilute one pump of Presoak into two gallons of water. Def. 56.1 Stmt. at ¶¶ 4-5, 18-20. A binder in a cage on the wall of the fourth-floor kitchen contained the "Apex Presoak Safety Data Sheet," which stated that Apex Presoak as sold is classified as "Eye Irritation, Category 2A" and that Apex Presoak at use dilution is "not a hazardous substance or mixture." *Id.* at ¶¶ 16, 34. The Safety Data Sheet also contained several warnings that users should wash their skin after coming into contact with Apex Presoak. *Id.* at ¶ 36. The dispenser used by De La Cruz was labeled "Apex Presoak," and an operational chart with pictures and written instructions (in both English and Spanish) was posted on the wall above the dispenser. Def. 56.1 Stmt. at ¶ 15; Pl. 56.1 Stmt. at ¶¶ 167-68. The operational chart included a picture of a bus pan with silverware entering the bus pan, as well as a picture of the dispenser and an instruction to add water. Pl. 56.1 Stmt. at ¶ 168. At the time of his deposition, De La Cruz did not recall whether he saw any posters or instructions relating to Apex Presoak on the wall of the fourth-floor kitchen. *Id.* at ¶ 216.

After he completed his shift, De La Cruz noticed that his pants and socks were soaked with the blue liquid and water he used to wash the trays. Def. 56.1 Stmt. at ¶¶ 46, 51-52. Although he changed from his work boots into sneakers before he left the hotel, he did not change his socks. *Id.* at ¶ 52. At the time he left work, De La Cruz did not feel any pain in his feet. *Id.* at ¶ 53. De La Cruz arrived home sometime between 4:30 and 5:00 a.m. on April 1, 2015. *Id.* at ¶ 54. When he removed his shoes and socks, he noticed that his feet were covered in blisters. *Id.* De La Cruz testified that he cleaned his feet and then went to sleep because he was tired and needed to rest. Deposition of Robert De La Cruz, Dkt. No. 35-7, at 155:5-12.

De La Cruz went to the emergency room of St. Luke's Hospital late in the evening of April 1, 2015. Def. 56.1 Stmt. at ¶ 55. The hospital initially classified De La Cruz as "Triage Acuity: Level

3

III–Urgent," and noted that De La Cruz "state[d] [he] was working and water got inside of his shoes when went to take off shoes noted toes with blister and blood. Denies burn to feet." *Id.* at ¶¶ 55, 56. The attending emergency room doctor, Dr. Ginno Blancaflor, wrote that De La Cruz "present[ed] with a chief complaint of burn . . . after had hot water fall on b/l feet about 36 hours ago" and noted that De La Cruz demonstrated "pos partial thickness burns of the right foot affecting all toes on dorsum and plantar surface about 1% ruptured blisters" and "partial thickness burns to left foot affecting smaller area." *Id.* at ¶¶ 58, 59. De La Cruz was transferred to the burn unit at New York Presbyterian Hospital early in the morning on April 2, 2015. *Id.* at ¶¶ 63, 64.

Dr. James Gallagher, a burn unit surgeon at New York Presbyterian, examined De La Cruz on April 2, 2015. Dr. Gallagher noted, "I have inspected the . . . burn wounds . . . . [T]hey are unlikely to heal [and] we will plan for surgery." *Id.* at ¶ 65. Dr. Gallagher's notes also reflected that De La Cruz suffered from "severe uncontrolled diabetes." *Id.* Other medical records confirm that at the time of his injury, De La Cruz suffered from several medical issues, including an over fifteen-year history of uncontrolled Type 2 diabetes, advanced diabetes-related peripheral artery disease of the legs and feet, and chronic kidney disease. *Id.* at ¶ 38.

Dr. Gallagher performed a skin graft operation on De La Cruz on April 24, 2015, observing that De La Cruz suffered from "deep second, third and fourth degree" burns on his right foot. *Id.* at ¶¶ 66-67; Dkt. No. 35-15 at 5. Between April 24 and July 10, 2015, surgeons at New York Presbyterian performed further operations on De La Cruz, including the amputation of his right leg below the knee and the amputation of his fifth toe on his left foot. Def. 56.1 Stmt. at ¶ 69.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the

4

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and he "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City*

5

*Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### III. DISCUSSION

Ecolab argues that it is entitled to summary judgment because—even assuming that Apex Presoak did in fact cause De La Cruz's injuries—De La Cruz cannot demonstrate that Ecolab knew or should have known that Apex Presoak could cause chemical burns. Without such evidence, Ecolab argues, it cannot be held liable for failing to include a warning about the potential for chemical burns on the Apex Presoak product. The Court agrees.

To establish a failure to warn claim under New York law, a plaintiff must show that "(1) the manufacturer had a duty to warn; (2) the manufacturer breached the duty to warn in a manner that rendered the product defective, *i.e.*, reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered loss or damage." *Hollman v. Taser Int'l, Inc.*, 928 F. Supp. 2d 657, 672-73 (E.D.N.Y. 2013) (citing *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997)). The failure to warn analysis is "identical under strict liability and negligence theories of recovery." *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001).

"A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, and of the danger of unintended (but reasonably foreseeable) uses of its product." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 81 (2d Cir. 2006) (citation omitted). "[S]ummary judgment is appropriate where a plaintiff has not introduced any evidence that a manufacturer knew or should have known of the danger at issue." *Bee v. Novartis Pharm. Corp.*, 18 F. Supp. 3d 268, 283 (E.D.N.Y. 2014); *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (quotation omitted) ("[I]n a proper case the court can decide as a matter of law

that there is no duty to warn."). Without evidence that a manufacturer knew or should have known about the danger alleged by the plaintiff, "no rational jury could conclude that defendant should have warned" the plaintiff. *Hollman*, 928 F. Supp. 2d at 661.

There are several ways that a plaintiff can demonstrate that a manufacturer knew or should have known that its product could cause a specific injury. For instance, the plaintiff could identify a relevant medical study or presentation that was known to the manufacturer before the time of the alleged incident which provided the manufacturer with sufficient notice of the product's dangers. *See Hollman*, 928 F. Supp. 2d at 676-77 (discussing a medical presentation authored by a company executive, but concluding that the presentation was "not sufficient to place defendant on notice of the possible risks of its product"); *see also Savage v. Beiersdorf Inc.*, No. 13-cv-0696 (DLI), 2016 WL 8711087, at *6 (E.D.N.Y. Sept. 30, 2016) ("Plaintiff has not submitted any published studies, medical reports or other evidence that would have placed Defendant on notice that the use of the . . . product could contribute to injuries . . . ."). Additionally, filed cases or public news reports regarding similar incidents could suggest that a manufacturer should have known about the potential risks of its product. *See Hollman*, 928 F. Supp. 2d at 677-78. The results of the manufacturer's product testing may also be instructive in the duty to warn inquiry. *See Colon*, 199 F. Supp. 2d at 93-94. A manufacturer does not, however, "have an unqualified duty to uncover all dangers that are scientifically discoverable." *Hollman*, 928 F. Supp. 2d at 678 (citing *In re Joint E. & S. Dists. Asbestos Litig.*, 762 F. Supp. 519, 526 (S.D.N.Y. 1991)). Instead, New York law requires only that a manufacturer "keep abreast of knowledge of its products as gained through research, adverse reaction reports, scientific literature and other available methods." *Id.* (citing *Baker v. St. Agnes Hosp.*, 421 N.Y.S.2d 81 (N.Y. App. Div. 2d Dep't 1979)).

Here, Plaintiff has not adduced any evidence—such as medical studies, court cases, reports of similar incidents, or the results of Ecolab's product testing—that could show that Ecolab either

7

knew or should have known about a risk of chemical burns resulting from contact with Apex Presoak. Indeed, Plaintiff's opposition to Defendant's motion for summary judgment entirely fails to address this issue. And the undisputed evidence in the record demonstrates that, other than Mr. De La Cruz's injury, Ecolab "has not received a single report associating Apex Presoak with a skin burn." Affidavit of Troy Sharratt, Dkt. No. 35-22, at ¶ 3.

The only evidence in the record which even arguably touches on the issue of what Ecolab should have known is the testimony of De La Cruz's expert toxicologist, Dr. Michael J. McCabe, Jr., who opined that exposure to Apex Presoak caused De La Cruz's burns. But Dr. McCabe explicitly stated that his opinion that Apex Presoak can cause skin burns applies to "Mr. De La Cruz and Mr. De La Cruz only," and acknowledged that "intrinsic factors of [De La Cruz's] body . . . [made] him susceptible" to chemical burns. Def. 56.1 Stmt. at ¶ 78, 88. Dr. McCabe's causation analysis— performed with the benefit of hindsight—says nothing whatsoever about what Ecolab knew or should have known at the time that De La Cruz used its product.[2] Because Plaintiff has not put forth any evidence which even suggests that Ecolab knew or should have known that Apex Presoak could cause chemical burns, Ecolab is entitled to summary judgment on Plaintiff's failure to warn claims.

---

[2] Dr. McCabe's report refers to three sources that he claims support the proposition that certain ingredients in Apex Presoak can cause irritation or burning on human skin. Dkt. No. 35-17, at 8 ("There are several references that support human exposure to detergent surfactants, including alcohol ethoxylates, cause skin irritation and/or burning."). De La Cruz did not include these references in his response to Ecolab's motion for summary judgment, nor has he or Dr. McCabe argued that these sources should have put Ecolab on notice that its product could cause skin burns.

8

## IV. CONCLUSION

For the reasons stated above, Ecolab's motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 35, to enter judgment for Defendant, and to close this case.

SO ORDERED.

Dated: January 16, 2020
New York, New York

_____
GREGORY H. WOODS
United States District Judge